Be seated. We want to welcome everyone to the Fourth Circuit this morning. We have four interesting cases. With great lawyers. The first case, Metzgar v. KBR, Inc. Ms. Burke. Good to have you here, Ms. Burke. Thank you. Good morning, Your Honors. My name is Susan Burke, and along with my colleagues, I represent the service members that have been injured by KBR's negligence. We are here today to ask this Court to reverse the District Court. The District Court's decision reveals a series of clear errors and a misapplication of the law. Now, obviously, with this panel, I need not belabor what that law is. We have the Supreme Court jurisprudence in Baker v. Carr, and then we have the teachings of this Court, both in the prior decision in this matter, the Burn Pit decision. We have Alshamari, and we have the Taylor case. So we have the jurisprudence that begins to carve out a certain set of very rare circumstances when a lawsuit against a private party, not against the United States, but when a lawsuit against a private party implicates military decision-making. That rare circumstance is not found here. I'm going to turn first to political question and then turn to the combatant activities preemption. Highlighting the District Court's decision, let's look first at what the District Court reasoned in terms of the service members' claim that they were harmed by KBR because KBR failed to follow the contractual directives by the military to refrain from burning hazardous material. It was very clear that the record evidence is uniform. All of the military officials, all of the KBR officials testified that KBR had never been given permission to burn hazardous waste, yet we have alleged in our complaint that that's exactly what they did. The Court admitted that he was not ruling on the merits, and that there has not been merits discovery on the breadth of these contractual violations. Yet, nonetheless, the Court precluded claims based on that misconduct. I thought I understood the District Court's statement to be that even if there were these isolated instances in which the contractors may not have complied with the strict letter of the contract, that that didn't overcome the fact that, in fact, the military had extensive pervasive control over the activities that were occurring in Iraq and Afghanistan. What's your response to that? Well, that's the clear error of the District Court. In order to rise to the level of direct and plenary control, there needs to be a level of physicality, a side-by-side direction. So, for example, if we look at the Carmichael case, you literally had military personnel interspersed with KBR, and in very real time they are controlling the performance. Well, but I thought the whole purpose of having the contractors was to allow the military to be at the fighting tip of the spear and not have to worry about these things. Well, exactly, Your Honor, and that's what we had here. Here we had the situation that's a far cry from Carmichael, but which is, in fact, the norm in the conflict theaters. And that is that the military decides to bring in contractors to do logistical tasks that it doesn't want to assign soldiers to. Why do you draw so much of a distinction between the concept of contractual control as opposed to operational control? Because contractual control is, by definition, indirect. Contractual control here, and the record is uniform, that, in fact, in theater, the contract mattered, and that all the parties agreed, yes, it had to be in writing, and all of the direction given to KBR had to be through... Did the contract matter to the exclusion of military necessity and military operations? No. Military necessity and military operations led to the need of the military to make decisions. Once those military decisions were made, they were not communicated directly to the contractor. Rather, there is an entire setup that is done to protect military commanders. They are not allowed to give direction right to KBR, and the testimony is clear. General Volmecki's testimony is the best place to look at this. And what he explains is that there was the creation of the contracting command, separate and distinct from the commanders, for the good of the mission. And he explains that that way is done to protect any questions of impropriety and protect the commanders from any responsibility to have to give direction, day-to-day direction to KBR employees. All of the war fighters, all of the operational command testified to exactly that. General Sanchez, General Vine, they both admitted, we could not direct KBR. What they had to do, and what in fact was done, is that their intent, their desires, and what they needed for their operations were conveyed to their colleagues, General Volmecki and the others in the contracting command. And it was the role of the contracting command to put that in writing and get that off to KBR. And weren't those authorizations done? Your Honor, they were done in 18 instances. So with respect to the use of surface burning, when we were here before the court last time, we knew there was one instance in which KBR was authorized to surface burn, and that was at Camp Taji. As we're here before Your Honors today, we have alleged that they used surface burning at 119 different locations. KBR now claims it has produced voluminous records and everything having to do with military control. When you go through those records, what you find is, yes, indeed, KBR did have permission to surface burn at 18 locations. So for those particular locations, there is indeed a military decision that was made, implemented through the contract command, the ACO gave direction to KBR, and they can surface burn there. So at those 18 locations, as we press our claims, as we further litigate the case, we are not going to and will not allege that the injury arose from the use of surface burning at those locations. Now, that doesn't end the matter at those locations, because even where they had that discrete permission to surface burn, they were also told quite clearly that they are not permitted to burn hazardous materials. So even at the furthest outreaches of the military permission to burn, there's a condition on that burning, and that condition is to not burn hazardous material. Now, the district court erred as a matter of both fact and law by trying to sidestep that issue and by simply saying, well, our allegations are vague. Well, first, obviously, we contest that, because there's a whole panoply of victim-specific affidavits on the record that we filed in response to the court's order. But even more importantly, analytically, you cannot invoke the political question doctrine, a separation of powers doctrine that strips this branch of the government from having the power. You don't strip that from the courts by merely saying something's vague. So the service members stand by all of our allegations at all 119 bases that KBR negligently burned substances that they were directly told not to. But KBR didn't have any discretion as to how to manage the waste, and there were no alternatives to the burn pits, were there? Oh, quite the contrary, Your Honor. They did have discretion. What was burned was not controlled by the government. This is a far cry from the Carmichael instance when you had the military right there. And I would suggest, Your Honors, that think of a hypothetical that would fit political question. That is an instance in which the military simply used contractors as soldiers. They simply supplemented their own staff, and they operated a burn pit using both soldiers and KBR employees working side by side. That's not the facts here. That's not the record here. The record here is very clear. KBR operated these burn pits completely divorced from any real-time military involvement. Well, but see, I guess the problem I have with that is you say it would be okay if the military were completely integrated working side by side by these contractors. But I go back to my initial question. The whole purpose of having these contractors was to make this a more seamless, efficient operation, and you're suggesting that exactly the opposite. It becomes more bureaucratic, more mechanical, more inefficient by virtue of the way you've described the process. Not at all, Your Honor. It actually becomes exactly what's needed, which is that it frees the military up to fight the war. So in the instances when the military wants to have help, what they do is they turn to the log cap. They turn to contracting. So that mechanism of using the bureaucratic measures, of using the written directives, using the ACO, that's the military's decision as to how it's best in their interest to go about obtaining logistical support. So when we give deference to the military's decision, we are deferring to their decision to stay out of direct and plenary control of contractors, to stay far away from that and let KBR deal with it on its own. In fact, the contract itself set up that process. KBR was to have its own management. KBR was to decide for itself whether or not to hire contractors, subcontractors. And when KBR hired subcontractors, it was on KBR. All of it, including even issuing quality reports, quality assurance reports. KBR not only had to manage itself, it had to report back to the military on how well it was doing. That entire contractual structure, you may view it as inefficient and bureaucratic and not consistent with war fighting, but the war fighters, the military, the people in charge of these decisions, they're the ones that made those decisions. Your colleagues highlighted testimony of another one of the commanders, Ricardo Sanchez, who seemed to suggest the exact opposite in terms of what you've depicted here, that the military had complete and plenary control, had made the decisions to use burn pits, and suggested that that's entirely consistent with Judge Titus' resolution of that issue here. Are they citing, first of all, is the testimony accurate? Have they cited it accurately? And how is it, if at all, inconsistent with the position that you're presenting here today? If your honors read the entirety of General Sanchez's testimony, which I strongly encourage you to do as well as General Vines, what you will see is that there is a little bit of inconsistency within the testimony. But General Sanchez testified quite clearly in support of what we are saying here today, which is that he understood himself not to have the power to direct KBR. But that's not exactly true because KBR didn't decide where the burn pits would be located, didn't decide the hours of operation, and didn't decide the height of the flames. The military did that. Your honor, that's actually inaccurate, and what I would suggest is that it really is something that calls for the discriminating inquiry required by Baker v. Carr. Each particular burn pit, and KBR's role in that burn pit, is all a matter of written official military record. So there are indeed isolated instances in which the military made a decision on hours of operation. Not at all 119 pits. It's akin to the way that the military, in 18 instances, did decide that KBR was to use surface burning. So the reality of that written record is that we needn't second-guess any military decision. We don't have to struggle to figure out whether General Sanchez's verbal order made it to KBR or not. What we have is a record that says, listen, the way KBR is indirectly controlled is through a contractual device through the ACO. That actually makes it easy to litigate the case because everything is right there in writing. There's no need to second-guess any military decisions. There's not even a big debate about what those decisions are because they are all done formally. They are all done through a writing issued by an ACO. So, for example, there is one particular writing with an ACO that directs KBR on burn pit hours on one pit. We cannot challenge that and we will not challenge that. So this is why the case is actually justiciable because there's no ambiguity. The procurement law and the way in which it requires everything to be formal and everything in writing and everything to be done as a matter of straightforward contract, with the creation of the contracting command, is the record. It is what was proved overwhelmingly by the record evidence. And that is an important point and that is the discovery was important to prove it. To prove that even in war zones, the military made a decision to use what may strike us as somewhat bureaucratic. But if that record was so clear, how did Judge Titus get it wrong? Judge Titus got it wrong because he misapplied the law and he ignored the factual record. And if you look at his memorandum opinion, what you'll see is he doesn't even engage with the reality of the contracting command. He simply conflates the two. He ignores testimony from General Volnick who says, you know, yes, actually war fighter generals on occasion get carried away and they think they have this power. I have to educate them that they don't. And they back down from that. He ignores the testimony from Sanchez, that Sanchez knew he couldn't direct KBR. He ignores the testimony from ACO Fenn who says it's illegal for General Sanchez to give orders. He ignores the testimony from Commander Walsh who says it's illegal, excuse me, it's impermissible for Sanchez to give orders. Can I quote a part of Judge Titus' order and tell me what is wrong with it? He says in part, I think this is at page 26 of the Westlaw version of the order, it is irrelevant here that the military's operational commanders in war zones did not give direct orders to KBR and instead effectuated its orders by using the contracting command, which he says is part of the military as a conduit. The fact remains that the orders came from the military commanders in the first instance. Is that correct? The reality is that the contracting command implemented the effect, but what the district court is not realizing in that is that the political question is not invoked merely because there's a military decision. It's only invoked when litigation requires evaluating the wisdom of that military decision. So the reality here is that the court failed to follow his own analysis to logical conclusion and failed to note that the intent to use surface burning only was formalized in the 18 places. But most importantly, he failed to understand that the litigation is not second-guessing any of the military decisions implemented through the contracting command. We are able to litigate this case because there's an entire area at all 119 bases which the military made a decision very clearly that KBR was not to burn hazardous materials. We're not questioning the wisdom of that. We're litigating saying that KBR failed to do that. The military made a decision that surface burning was allowed to be used by KBR in 18 instances. We're not questioning the military wisdom of that. We're litigating and saying that regardless of their use of surface, that it wasn't their use of surface burning, it was what they burned. So you see how the district court simply failed to understand how just identifying a military decision is not the task, is not the judicial analytical task. And I apologize. I see I have run over. Thank you, Your Honor. You saved some time. Yes, Your Honor. I saved seven minutes for rebuttal. Mr. Harris. May it please the court. My name is Warren Harris and I represent KBR. In the prior appeal, this court resolved the threshold legal questions and remanded for additional evidence and findings as to who, whether KBR or the military, made the disputed decisions about how KBR performed its services on the battlefield. On remand, the district court found, as a matter of fact, that the military made all of the key decisions at issue in this case. Now, plaintiffs have abandoned one of their main allegations and many of their witnesses. They ignore the evidence they fought to get and retreat to relying solely on the contract languages as none of this ever happened. These suits were properly dismissed under the political question doctrine as well as the combatant activities exception to the Federal Tort Claims Act, and this court should affirm on either ground. The facts here confirm that the suits were correctly dismissed under the political question doctrine. The overwhelming evidence on remand supports the district court's findings that the military controlled KBR by making the key decisions underlying plaintiff's claims. Was there a requirement that the military have day-to-day control of operations in order to overcome this lawsuit? Your Honor, the test is plenary control, and plenary control was established here because the military determined things like where the burn pits were going to be located. That was one of the major claims. Well, but your opponent says they determined that, and then the contractor violated the dictates of the order by establishing burn pits beyond the 18 or so that they say were actually authorized. Is that incorrect? That is incorrect, Your Honor. Looking at authorization, it's clear that General Sanchez made the order that burn pits would be used by KBR in the military, and you had asked earlier about where that is in the record. It's JA-4859. General Sanchez clearly testified to that. Without limitation? He said that he can't give a direct order to the contractors, but no one here is claiming that he could. His orders are passed to the contractors through the DCMA as a conduit. Everyone agrees on the contracting process, but here the type of waste disposal to be used, whether it's going to be a burn pit or an incinerator or recycling, is a military decision that has to be made by the military because the military has to balance factors looking at operational, logistical, and safety concerns. But when your colleague suggests that there were limitations with respect to these burn pits at specified locations, is she just incorrect? The record doesn't support that? On the location, it's undisputed that the military made all of those decisions. And did not limit the locations to the 18 or so that they say were actually authorized by some kind of written dictate or order? I believe that goes to the authorization issue. What the plaintiffs are arguing, as I understand, is that there is paperwork that shows that KBR had authority to operate 18 bases. But the record in this case isn't limited to that paperwork. The plaintiffs want to look only at the contract and say that's all that matters and ignore all of this evidence. We have to look at where this decision starts. It's made by operational commanders. General Sanchez made the decision. It's communicated to the contractors through the DCMA as a conduit. I mean, the argument that the burn pits here were unauthorized is really, it's absolutely not supported by this record. Because we have a situation where burn pits were being operated in plain view of thousands of soldiers across two theaters of war. The DCMA inspected the burn pits. The DCMA evaluated KBR's work. The military decided where the burn pits were to go. So for the plaintiffs to stand here and say that there were only 18 burn pits that were authorized and KBR had no authority to operate any other burn pit, it's contrary to the record, it's contrary to Judge Titus' findings, and his findings are not clearly erroneous. So where are your other authorizations? Because it strikes me that you didn't produce a whole lot of paperwork in this case about that. So I guess the question is, did you need an authorization for the other 101 burn pits? And if you did, how did you get it? The record shows that all the burn pits KBR operated were authorized. The record shows that KBR operated 31 burn pits in this case. The rest were operated by the military. The authorization comes from General Sanchez. He made the determination for the entire theater of war. That was then passed through the DCMA as a conduit to KBR. The DCMA gave KBR a task order. It began with Task Order 59, then Task Order 89, then two subsequent task orders. That is the authorization for every burn pit that KBR operated. And that was a blanket task order? The task order is for waste management to handle waste disposal. And that started with Task Order 59. It was amended several times. There are several amendments to it. Then it was replaced by Task Order 89. And then there were two subsequent task orders that also applied here. And the task order directed KBR to handle waste management. Now, how that would be done was controlled by the military. The military determined it would be done by burn pits. KBR had no discretion to use an incinerator, and that's one of the allegations in this case, that KBR should have used incinerators. The undisputed facts here, and all the military testimony, is the decision to use burn pits was a military decision, and KBR had absolutely no discretion to use incinerators. The military made that decision. And the military at some point later in the war did put incinerators at some bases, but that was dealt with a funding issue. When the military first tried to do that, there was a funding problem, and it violated the Antideficiency Act, which delayed the implementation of incinerators. Incinerators also required vast amounts of transportation, and General Sanchez said he needed that transportation to do things like haul ammunition. It also implied a permanent presence in Iraq that the military was trying to avoid. Those were all military decisions. Looking also at the operation of the burn pits, where they would be located, it is undisputed that the base commanders in every instance told KBR where the burn pit would be located. So in light of all of this evidence, it's contrary to this record and contrary to Judge Titus' findings to say that the only evidence in this record is that KBR was authorized to operate 18 burn pits, because General Sanchez's order and the task order applied to the entire theater of war. There's a related allegation in this record that even if you're correct, that certainly there was no authority to burn some of the material that was actually burned at these pits, including batteries and other items that just were toxic and dangerous. What's your response to that? A couple of points, Your Honor. First, we're looking at burning prohibited items. Let's start with the evidence they have. Plaintiffs cited these declarations that were filed in 2011. Those are not evidence. They were filed in 2011 in this case. It was undisputed on this record that they're not based on personal knowledge. They were never cited to the district court in response to the motion to dismiss. There was a different set of declarations. It was cited to the district court in response to the motion to dismiss. Plaintiffs abandoned reliance on those. The ones they're citing now on appeal were filed in 2011. They're not based on personal knowledge. They were not cited to the district court. They're not even in the joint appendix. That's the evidence they rely on. The evidence that the district court considered was two pieces of evidence, one dealing with the base in Iraq and one dealing with the base in Afghanistan, that alleged that KBR burned substances which weren't allowed to be burned. The district court addressed that evidence. On page 5096 of the joint appendix, the district court said that these allegations are vague and they don't show that KBR violated the contract and aren't sufficient to negate the overwhelming evidence of military control. The district court dealt with that evidence, and the district court's findings are not clearly reliable. Wasn't there also some evidence of admittedly someone who was a plaintiff in this case by the name of Kevin Robbins who suggested that he was essentially left to his own devices with respect to the burn pit that he operated? Yes, Your Honor, and the district court also dealt with Mr. Robbins. The district court looked at his testimony and said he was not credible. I don't have the JA site on that. It may be JA 5080, but the district court did address Mr. Robbins and simply found his evidence to be not credible, and that was a proper factual determination for the district court to make. So the district court addressed the evidence of violations, and also even if KBR's conduct wasn't perfect, that's not the requirement for actual control. If you look at Carmichael, there were allegations in Carmichael that the driver did things improperly, and actually as the record showed that the driver was driving too fast whenever he approached the S curves that were in the road. The driver wasn't paying proper attention, but the court nevertheless found that the political question doctrine applied in that case. So even if there was some evidence in this case, which the district court found there isn't, and it doesn't overcome the overwhelming evidence of control, but even if that were the case, that wouldn't negate the application of the political question doctrine here. Can we dispose of this case just under the first Taylor factor, or do we have to go to the second Taylor factor? Your Honor, the first Taylor factor would be sufficient. The court could rely on either. The first Taylor factor dealing with actual control is clearly established here. The district court made that finding. The district court also made a finding on Taylor factor number two, but the court need not reach that, of course, if it finds actual control under Taylor factor number one, and that would be an appropriate disposition because we have the situation where the court, of course, the law has now percolated. The law is fairly settled on many of these issues. The court in the first appeal set out what the law is, simply remanded the district court for fact findings. The district court developed that record. There were over five million pages of documents produced. There were over three million pages of emails produced. Of that, plaintiffs have now cited seven emails to this court. Out of all that discovery that was done, there were 34, I believe, depositions taken. The district court allowed collectively the parties to take 60. The parties took 34 depositions. The record is now fully developed. The district court has made fact findings on these issues, and those fact findings are not clearly erroneous. The district court's fact findings is that there's actual control because the military decided what method of waste disposal would be used, where the burn pits would be placed on the basis, what would be burned, what the hours would be, the height of the flames. There's pervasive military control similar to what the court found in Carmichael. In this case, it's analogous to the Carmichael decision. And this court should uphold the district court's finding on actual control and affirm on the political question doctrine. How about the combat activities exception? Yes, Your Honor. Let me turn to that issue. As an alternative ground, plaintiffs' claims are also preempted by the combat activities exception to the Federal Court Claims Act. The scope of preemption here is even broader than the test for justiciability under Taylor. The ultimate inquiry for preemption is whether a state law touches the military's battlefield conduct and decisions. This means that suits are preempted when they affect activities stemming from military commands. And the undisputed material facts here show that plaintiffs' claims are preempted. Are these mutually exclusive? If we find that the political question doctrine doesn't bar the suit, doesn't that necessarily result in this exception also not applying? It doesn't, Your Honor. The test is a little different, and preemption is broader than the justiciability test under Taylor. So even if the court were to find that the political question doctrine doesn't bar the case, the court could then find and should, in that instance, find that the combat activities exception allows preemption in that case. But there's a bit of overlap here, isn't there, between control and integration? So wouldn't a finding of lack of control suggest that there wasn't integration? There is overlap, but because the preemption test is a little broader, I think the court would be able to find that there was no plenary control under Taylor but still find that there was preemption, and that's because the preemption test looks at whether the state lawsuit touches the military's battlefield conduct and decisions, and they're preempted whenever the suits affect activities stemming from military commands. So the test here is even broader. And, of course, for preemption, the court looks at the degree of integration that, in fact, existed. And here KBR was integrated into the military's battlefield operations because the military dictated all of the main aspects of KBR's work. Because the military decided to use burn pits in the first instance, the military decided where to put them and what would be burned, the military decided when and how substances would be burned, and the military decided if and when any alternatives to burning would be used. And as a result of all of those undisputed facts – Okay, so that gets back to my earlier question. But if we have found to the contrary, when looking at the political question doctrine, doesn't that effectively decide this question as well? Your Honor, if you find that Judge Titus' findings are clearly erroneous and you disagree with him on the facts, then that would affect this. But I believe because the preemption test is broader, the court could say Judge Titus' findings are not clearly erroneous, but the court could find that the case isn't non-justiciable under the test in Taylor. The court then, looking at those same facts, assuming it credits Judge Titus' facts, could then look at the analysis under preemption and look at the question of whether the state lawsuit touches the military's battlefield conduct and decisions, and the suit would be preempted because it affects activities stemming from the military commands. So basically it's a broader test. And the court, if it credits the evidence, could possibly find that it's not non-justiciable under the political question doctrine but still find that it's preemption. But you're absolutely right. There's a lot of overlap with the control of the factors, but I think there is a slight distinction between the two tests that would allow the court to find preemption, even if the court decides that the political question doctrine doesn't apply. To follow up on Judge Diaz's question, if we found against you on the first Taylor factor, based on Judge Titus' order, wouldn't we have to remand for further evaluation of the second Taylor factor? I don't believe so, Your Honor, because I believe Judge Titus also ruled on the second Taylor factor, and I think the court could uphold the district court's opinion on either factor. So I believe the court has the record in front of it that it could decide both Taylor factors and decide one or two, either or both of those. But Judge Titus didn't do the choice of law analysis. He didn't, Your Honor, and the reason he didn't is because when this case was before the court previously, the focus was on KBR's defenses. And what Judge Titus looked at, whenever the case was on remand, were plaintiff's claims. And there's not a choice of law analysis that's required there. And you have to look at plaintiff's claims and KBR's defenses. Judge Titus looked at plaintiff's claims and said, looking just at plaintiff's claims, I find that the case is barred under prong two of Taylor. So that's why the district court didn't engage in the choice of law analysis, because in looking at plaintiff's claims rather than KBR's defenses, it wouldn't have been necessary to do. So that's the reason, Your Honor, I believe the court can address Taylor prong two without the need to remand to Judge Titus. In addition to all the control factors, there are other facts that reinforce that KBR was integrated. There's no dispute here that KBR worked closely with military personnel. KBR worked side by side with the military, met regularly with the DCMA and uniformed personnel, and in fact had its liaison officers embedded with the military's operational command. All of this was vital to ensure that the military's goals were achieved and in accordance with the military's operations. So in sum, these undisputed facts establish that KBR was integrated with the military's combatant activities such that preemption also applies. If the court has no further questions, I'll give my remaining time back to the court. Thank you very much. Thank you. Ms. Burke. KBR claims that the district court did not make a clear error by relying on General Sanchez. The district court's reliance on the verbal directive claimed to have occurred by General Sanchez is directly contradicted by the task orders and the letters of technical direction and ACLs that were issued during General Sanchez's tenure. Those written documents told KBR that they were not to use surface burning unless they obtained a permission from the ACO. It was KBR's obligation, if they thought that the warfighter wanted them to use surface burning, it was KBR's obligation to make sure that the contracting command gave them the ticket to use surface burning. They didn't go and get those tickets. They only got it in 18 locations. That leaves the record crystal clear about the scope of the military authorization. It is a clear error and showing a faulty logic for the district court to seize on to Sanchez and Vine there after the fact testimony that, well, we must have intended to give KBR an order to use surface burning. You have to look at the contracting command. Well, I thought you said that they didn't do that. Are you saying now that they did but they're just surmising this after the fact? Well, I think when you read the testimony, when you read the entirety of the testimony of both General Sanchez and General Vine, and you read not just what they said at the hearing but all of their testimony, what both gentlemen testified is that they knew they didn't have the power to direct KBR. Well, let me ask you to respond to a quote from Lieutenant Colonel Walsh. The service member's own witness stating that it is highly improbable that KBR could have located, constructed, and operated an enduring burn pit without awareness and authorization of the military units. The record shows that awareness does not matter. That's not the point. The point is you have to locate what was a military decision. You don't want to begin to create a standard that we assume a military decision was made simply by awareness. And it's also a faulty logic for the district court to rely on the fact that the flames were evident because the truth is the military itself operated a lot of pits. So a war fighter wouldn't even necessarily know who was operating that pit when they saw the flames. So what you have to look at is, okay, well, what was the military decision? And on that, that is a justiciable issue. As the Harris Court pointed out, litigating what were the precise contours and what was the military decision is something that the courts are well-suited to do. And here the record is very clear. And the record, you cannot conflate the war fighters with the contract command. You have to say how does the military make decisions on directing KBR. All the testimony shows that you make the decisions to direct the contractor in writing via the contracting command. Okay, now let's look at what was actually done. During General Sanchez's tenure, there were writings directing KBR not to use surface burning. So the reality is that the military qua military made precisely the decisions that said do not use surface burning. Now, they did in 18 instances say you are to use surface burning. We're not challenging that. KBR had ample opportunity to come forward with another 101 letters saying, oh, we were allowed to use it here. We were allowed to use it there. They have not done that. Now, as the litigation progresses, if they find another letter giving them permission, we then won't challenge the use of surface burning there. But none of this makes this non-justiciable. None of it rises to the level of a political question that's beyond the power of the judiciary to adjudicate. In fact, it's like the advocate case. This is quintessentially a question for the judiciary. We're a private party suing a private entity. There's simply no intrusion on military decision-making by holding KBR to the terms of its contract. I would note again, KBR does not dispute that the district court judge simply evaded the whole issue of hazardous material on vagueness. That's not an appropriate analysis in order to reach a political question. And KBR can come forward with no evidence, not a single writing that gave them permission to burn batteries, for example, or any other hazardous materials. So when you look at the narrow scope of the doctrine that has been developed to ensure that lawsuits against defense contractors don't inadvertently and impermissibly intrude on military decision-making, this case does not fit there. Ms. Clark, can you point me to the where in the record statement you made earlier that said that there were written directives telling the contractor not to use burn pits? Where is that in the record? Yes, they are in the task orders themselves. So when your colleague described the task orders as just general affirmative directions, that's incorrect? That's flatly incorrect. When you read the task order, it says that surface burning may be used only with the permission of the ACO. Now, there are a series of task orders, and we lay this all out with these citations in our brief. There are a series of task orders that applied over time. And so at any point in time, for example, during General Sanchez's tenure, he was there 03-04. So if you want to look at what KBR was directed to do during his tenure, you go to the first task order. And so when you look at the task order in effect at that time, it clearly said surface burning was a last resort and could only be used with ACO permission. And it's important to note KBR's own witnesses, Mayo, Singleton, and all of the KBR management, Peter Nance, they directly testified, we took our direction only from an ACO. So there really is no dispute about what KBR itself looked to when it tried to determine what was the military direction to us. And so in addition to the task orders themselves, we have appended a chart in which we lay out all of the base numbers of these 18 directives. And I believe that's at JA 4458, Your Honor, but I apologize, I may need to correct that. But that chart lays out all of the base numbers of these 18 directives. So this is a matter of black and white. I'll just briefly speak on combatant activities. The district court cannot rule on summary judgment. He made all sorts of credibility determinations, weighted the evidence. So just as a matter of under Anderson Liberty Lobby, he just did not have the findings of fact you would need. There's clearly disputed facts. And then in addition, the integration, he misapplied the law. There's not the level of integration that you need in order to apply that exception. Thank you, Ms. Burke. Thank you. Appreciate it very much. We'll come down and greet counsel and then go to our next case.
judges: Robert B. King, Albert Diaz, Henry F. Floyd